70 F.3d 1281
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
James Norris WALKER, Plaintiff-Appellant,
v.
CITY OF OAKLAND, Oakland Police Department, J. Pertoso, P.
Heiser, Sgt. Politzer, Chief George Hart, Sgt.
Arthur Roth, Sgt. Brian Thiem,
Defendants-Appellees.
 No. 94-17142.
 United States Court of Appeals, Ninth Circuit.
 Submitted: Sept. 27, 1995.*
Decided: Nov. 15, 1995.
 
 Before: SNEED, SKOPIL, and FERGUSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 James Norris Walker, a Mississippi state prisoner, appeals pro se the district court's summary judgment in favor of defendants. Walker, in his Amended Complaint, alleged that, in connection with his arrest on April 3, 1989, the defendant officers, members of the Oakland, California Police Department, violated his 42 U.S.C. 1983 civil rights. We review the grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995). We affirm the judgment of the district court.
 
 I.
 FACTS DERIVED FROM STATEMENTS OF OFFICERS
 
 3
 On April 3, 1989, defendant Sgt. Politzer was informed by the Criminal Investigation Division, Homicide Section, of the Oakland Police Department that Walker, a murder suspect wanted on a warrant issued by the State of Mississippi, was presently at 1420 Auseon Avenue in the City of Oakland. Politzer was asked to go to the address and arrest Walker. He was informed that Walker had used a nine millimeter handgun in the murder and it had not been recovered. This was the type of duty Politzer had previously performed for the Criminal Investigation.
 
 
 4
 Politzer assembled Officers Pertoso, Heiser (also defendants in this case), Sullivan, T.K. Lewis, and Ken Lewis to assist him in arresting Walker. All were in police uniform. Politzer informed the officers of the task they confronted and gave them the physical description of Walker, including the fact that he was dressed in a red shirt and blue jeans and that, because the pistol used in the murder had not been recovered, he might be armed.
 
 
 5
 Upon arriving at 1420 Auseon Avenue, Politzer assigned Officers Heiser, Sullivan and Pertoso to watch the rear and the sides of the house while he and Officers T.K. and Ken Lewis would go to the front door. Politzer and Ken Lewis went to the front door while T.K. Lewis remained near the bottom of the stairs.
 
 
 6
 Politzer knocked at the front security gate and Walker walked up to it. He was asked by Politzer if he were "James," to which he responded affirmatively. Politzer then told him he was under arrest. Walker's clothing was as it had been described to Politzer.
 
 
 7
 Walker did not surrender. Instead he turned and ran through the house and dived head first through a kitchen window covered by a security screen located on the north side of the house. Pertoso, who was covering that side, observed Walker's unusual exit from the house and shouted, "Stop! Police!" Walker did not stop, but commenced running in a northwesterly direction. Politzer, having abandoned his position at the front door, ran toward the north side of the house and confronted Walker and shouted, "Freeze! Police!" Walker did not respond and continued running in a crouched position. Politzer again shouted "Freeze! Police!," to which Walker responded by continuing to run and climbing over a small cyclone fence. Politzer was losing ground. He fired two shots at Walker at a distance of what he estimated to be 30-40 feet. Walker did not slow down. Pertoso, who had been on the north side of the house, ran to its front and from a distance estimated at 70-80 feet, fired one shot at Walker who appeared to trip and stumble slightly.
 
 
 8
 At this point three shots had been fired at Walker, who obviously knew police wanted him to stop to enable them to arrest him. Nonetheless, he kept running. He came to a six foot high cyclone fence and commenced climbing it. Politzer fired two more rounds as Walker was going over the fence; these seemed to have no effect. Walker, now over the fence, ran toward the garage, which had been Politzer's background for his last two shots. Walker disappeared from Politzer's view, apparently moving eastward. At this point, seven shots had been fired at the fleeing Walker.
 
 
 9
 In the meantime, Heiser, from his position at the rear of 1420 Auseon, heard the commotion and moved to the north side of the house where he saw Walker running away and at whom Politzer was then firing his revolver. Heiser drew his revolver and, after hearing other officers shouting that Walker was running eastward, joined the chase. He began to run, and, after some help from a neighbor who had seen the fleeing Walker, came to the rear of 1460 87th Avenue, at which there was a six foot wooden fence. Toward its bottom was a long board on which Heiser could stand. When he looked over the fence he saw Walker hunched over between the fence and a shed. Heiser yelled, "Freeze! Police!" Walker ran from behind the shed and Heiser fired a shot at him from a distance of twenty to twenty-five feet. He continued to run toward the east and Heiser fired another shot, which again did not appear to have any effect upon Walker.
 
 
 10
 Officer Nuno, not a member of Politzer's party but rather an officer on patrol duty in a marked police vehicle, received information from his radio that the chase of a black male murder suspect wearing a red shirt and blue pants was taking place in his area. Officer Nuno drove east on Holly Street and, while doing so, passed Officers T.K. Lewis and Sullivan running eastward. Nuno then turned south on 88th Avenue, where halfway down the block at which he turned he heard two shots which appeared to come from the west.
 
 
 11
 Nuno stopped his patrol car, got out, and started toward its front when he saw a black male wearing a red shirt and blue pants coming down the driveway at 1451 88th Avenue. The runner passed a householder working in his yard and approached Officer Nuno. Because of the proximity of the householder, Nuno tackled Walker rather than attempt to stop his progress by a command supported by a drawn weapon. In his struggle with Nuno, Walker appeared to favor his right side. Officer Sullivan appeared on the scene and assisted in subduing Walker and handcuffing Walker's arms behind his back. Walker was bleeding from his left hand and the rear of his right upper thigh.
 
 II.
 WALKER'S FACTUAL ALLEGATIONS
 
 12
 The allegations of Walker are both general and lacking in consistency. The most specific appears in his "Plaintiff's Response to Defendant's Special Report," filed January 4, 1994, in which the following appears:
 
 
 13
 Plaintiff was shot by Ofc. P. Heiser. Officer Heiser discovered the Plaintiff concealed by a fence and ordered him to stop. Plaintiff stopped and Ofc. Heiser shot Plaintiff in the rear thigh. Plaintiff then raised his hands and Ofc. Heiser shot Plaintiff in the left hand. Plaintiff then in fear of his life and having been twice shot while standing still, continued to run. A total of nine shots were fired at Plaintiff who was unarmed and did not pose a threat to anyone.
 
 
 14
 C.R. 32 at 2.
 
 
 15
 A different and less specific allegation appears in Walker's earlier declaration filed on November 12, 1993, in which he states:
 
 
 16
 When the police come to the door I went to answer the door I saw it was the police an I started running. I ran back into the kitchen an jumped out the kitchen window.
 
 
 17
 An started to run the police started shooting at me so I jumped a fence the police continue shooting so I jumped another fence the shooting continue. Then I jumped a third fence the shooting stop for a minute then I jumped a forth fence an the police shot me in my leg an I stop an put my hands in the air an the police shot me in my hand. So I started back running until the police pull his car in front of me an jumped out of his car with his gun an order me to lay down after the police order me lay down he walked over an kicked me in the side while I was laying on the ground.
 
 
 18
 The police knew I didn't have a gun my sister told the police I didn't have a gun. She is the one who set it up so I would be at home when the police came.
 
 
 19
 C.R. 28 at 1.
 
 
 20
 Walker tells a similar version in a statement attached to his original complaint, filed June 24, 1992:
 
 
 21
 I was staying with my sister in Oakland, Calif. the police came to my sister house to arrest me so I jump out a window start to run the police start to shot so I jump a fence the police continue shotting so I jump another fence they are still shotting one of the officer shot me in my leg so I stop an put my hands up the officer shot me in my hand so I start back running until a police pull his car in front of me jump out an pull his gun on me so I stop an get on the ground.
 
 
 22
 Also my sister is the one who set it up so I would be at home when the police came she also told the police I didn't have a gun.
 
 
 23
 C.R.1 at 4.
 
 
 24
 Finally, Walker, in his Objection to Defendant's Motion for Summary Judgment and Certificate of Service, filed August 26, 1994, provided the following information:
 
 
 25
 On April 3, 1989 plaintiff was residing at his sister's home in Oakland.
 
 
 26
 Plaintiff's sister notified the police that plaintiff was residing in her home.
 
 
 27
 Plaintiff avers that his sister informed the police that he was unarmed.
 
 
 28
 Upon arrival of police to plaintiff's sister's residence, he answered the door. And upon seeing police he began to run. Plaintiff asserts that he did not impose a threat or imminent threat of bodily harm towards the Oakland Police Officers who arrived at his sister's house.
 
 
 29
 Plaintiff jumped through a window and police officers pursued him and ordered him to freeze but he continued to run.
 
 
 30
 Plaintiff states that upon hearing the weapons of police being discharged he stopped and raised his hands in the air; but after being shot in the hand and thigh he continued to run.
 
 
 31
 Plaintiff asserts that no charges have been brought against him by the California authorities. And, plaintiff was never convicted of resisting the arrest or any other charges in relation to this incident.
 
 
 32
 C.R. 58 at 4-5.
 
 III.
 CONCLUSION
 
 33
 To secure a reversal of the district court's summary judgment, Walker must have made in the district court "a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Supreme Court, on the same day it decided Celotex Corp., explained this standard in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), by stating:
 
 
 34
 In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently ... the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant.
 
 
 35
 "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S.1, 7 (1985). For Walker to prevail in his 42 U.S.C. Sec. 1983 civil rights action he must establish that the officers who fired at him had no probable cause to believe that he posed a threat of serious physical harm, either to any of them, or to others, during the time of his flight. This standard was enunciated in Tennessee v. Garner, 471 U.S. at 11, where the Supreme Court stated:
 
 
 36
 Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.
 
 
 37
 Applying the standard set forth in Anderson v. Liberty Lobby, Inc., supra, and Celotex Corp. v. Catrett, supra, we hold that Walker has failed to establish that the officers who fired at him had no probable cause to believe that he posed a threat of serious physical harm to them or others during his flight. This precludes submission of his claim with respect to each of the defendants to a jury. Consequently, we must affirm the district court's judgment.
 
 
 38
 It is only with respect to Officer Heiser that Walker's claim has any substance. Walker, in the previously cited "Response to Defendant's Special Report," does allege that Heiser shot him twice, once after he stopped, and once after he raised his hands. This statement standing alone probably would be sufficient to require a denial of Heiser's motion for summary judgment as it would indicate an unreasonable use of deadly force. It does not stand alone, however. In each of his other filings, the role of Officer Heiser is not given prominence. In his declaration filed on November 12, 1993, the suggested time at which he was shot possibly points to Heiser, but in his "Objection" filed on August 26, 1994, any link between the wounds and Heiser's firing disappears. Rather, he emphasizes his allegation that he was unarmed and that the police knew it. These vacillations in Walker's account, when measured against the internal consistency of the officers' accounts, justified the judgment of the district court.
 
 
 39
 Walker also contends that the district court erred by granting summary judgment without allowing additional discovery. We review de novo the district court's failure to address the discovery motion before granting summary judgment. Qualls v. Blue Cross, 22 F.3d 839, 844 (9th Cir.1994). Walker is required to show how additional discovery would have defeated summary judgment. See Qualls, 22 F.3d at 844 (reviewing trial court's implicit denial of further discovery). Walker has failed to make such a showing, and accordingly, we conclude that the district court did not err by granting summary judgment without allowing further discovery.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3